UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
ARTHUR PICCOLO,
                                    :
            Plaintiff,          REPORT & RECOMMENDATION
                                    :
        -against-               05 Civ. 7040 (GBD)(MHD)
                                    :
NEW YORK CITY CAMPAIGN FINANCE
BOARD,                              :

            Defendant.    :
------------------------------x

TO THE HONORABLE GEORGE B. DANIELS, U.S.D.J.:


     Plaintiff Arthur Piccolo filed his amended complaint on August
29, 2005, alleging that he had been denied access to three
election-related programs administered by the Campaign Finance
Board ("CFB") during the months leading up to the 2005 New York
City mayoral election: 1) the matching-funds program; 2) the debate
program; and 3) the voter guide publication. Mr. Piccolo primarily
contends that these exclusions were a result of program deadlines
and criteria that violate the First and Fourteenth Amendments of
the federal constitution. The complaint also seems to suggest
violations of New York State and City law.


     The complaint requests relief in several forms. First,
plaintiff requests a three-faceted permanent injunction requiring:
1) his inclusion in the primary debate that took place on
Wednesday, September 7, 2005; 2) addition of his profile and

1

photograph to the 2005 primary Voter Guide or publication of a supplemental document containing his profile and photograph; and 3) CFB certification that would allow his participation in the matching-funds program for the 2005 primary election.

Second, Mr. Piccolo's amended complaint requests that the court enjoin implementation of the deadlines of each of the CFB's three election-related programs in future elections. Third, Mr. Piccolo seeks damages in the amount of $2,500,000 to compensate for the alleged monetary loss suffered by his campaign.

Before filing an answer, the defendant moved to dismiss the amended complaint on September 27, 2005, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).[1] In support of its motion, defendant asserts that this court lacks subject-matter jurisdiction because Mr. Piccolo's claims are moot and, in any event, can only be redressed by an entity not party to this lawsuit. Defendant also argues that the complaint fails to state a viable claim for relief. For the reasons discussed below, we

---

[1] The CFB filed an earlier motion to dismiss in response to plaintiff's initial complaint, filed on August 8, 2005. Mr. Piccolo had also previously proceeded on two orders to show cause seeking preliminary injunctive relief. The first was denied in a proceeding before Judge Karas on August 12, 2005. (Tr. at 42-47; August 29, 2005 Order). The second, submitted on the same date as the filing of the amended complaint in this action, was denied on that date by Judge Daniels. (August 29, 2005 Order).

recommend granting defendant's motion to dismiss on the basis of plaintiff's failure to state a claim.

I. <u>Background</u>

Defendant moves to dismiss on both 12(b)(1) and 12(b)(6) grounds. Where a party seeks dismissal under Federal Rule of Civil Procedure 12(b)(1), the court may in some instances take into consideration evidence outside of the pleadings, such as declarations or affidavits. See <u>Alliance For Environmental Renewal, Inc. v. Pyramid Crossgates Co.</u>, 436 F.3d 82, 87-89 (2d Cir. 2006)(summarizing procedures available to court on Rule 12(b)(1) motion); <u>Makarova v. U.S.</u>, 201 F.3d 110, 113 (2d Cir. 2000)(confirming that the district court may refer to evidence beyond the pleadings on a 12(b)(1) motion); <u>Stevenson v. Pagan</u>, 2006 WL 2354808, at *1 (S.D.N.Y. March 21, 2006) <u>adopted by</u> <u>Stevenson v. Pagan</u>, 2006 WL 2356018, at *1 (S.D.N.Y. Aug. 14, 2006)(using defendant-proffered declarations and documentation, as well as information judicially noticed, to assess 12(b)(1) motion).

On a motion to dismiss pursuant to 12(b)(6), the court may consider only the pleadings and "documents attached to the complaint as exhibits or incorporated in the complaint by reference, . . . [as well as] matters of which judicial notice may

be taken under Fed. R. Evid. 201." <u>Kramer v. Time Warner, Inc.</u>, 937 F.2d 767, 773 (2d Cir. 1991); <u>accord</u> <u>Newman & Schwartz v. Asplundh Tree Expert Co.</u>, 102 F.3d 660, 662 (2d Cir. 1996). The court may also "rely on matters of public record," <u>Pani v. Empire Blue Cross Blue Shield</u>, 152 F.3d 67, 75 (2d Cir. 1998), and review documents that are deemed "integral" to the pleader's claim. <u>See</u>, <u>e.g.</u>, <u>San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.</u>, 75 F.3d 801, 808-09 (2d Cir. 1996); <u>International Audiotext Network, Inc. v. AT&T</u>, 62 F.3d 69, 71-72 (2d Cir. 1995).[2]

A. <u>Pertinent Facts</u>

In beginning his bid for the mayoral post in the 2005 New York City election, Mr. Piccolo collected and submitted petition signatures, as required by the New York State Election Law. (Am. Compl. 2). <u>See</u> N.Y. Elec. Law §§ 6-118 to -158.[3] In a letter dated

---

[2] Because the plaintiff's complaint itself does not detail the chronology of events leading to this action and certain significant events taking place after the filing of this motion, our account of pertinent facts relies in part upon the documents accompanying the plaintiff's complaint, as well as matters in the public record and facts of which we take judicial notice, such as election dates and results.

[3] The election law specifies that "[a] designating petition shall be filed not earlier than the tenth Monday before, and not later than the ninth Thursday preceding the primary election." N.Y. Elec. Law § 6-158(1). The same section also requires that "[a] certificate of acceptance or declination of a designation shall be filed not later than the fourth day after the last day to file such designation." <u>Id.</u> at § 6-158(2). Because the

July 15, 2005, New York City's Board of Elections ("BOE") notified plaintiff that a petition had been filed with the BOE designating him as a Democratic Party candidate to appear on the primary election ballot for the 2005 mayoral race. This letter instructed Mr. Piccolo to file an acceptance or declination of that designation by July 18, 2005, in accordance with the Election Law. (Am. Compl. Ex. 2). See N.Y. Elec. Law §§ 6-146, 6-158. Mr. Piccolo timely filed the required certificate of acceptance on July 18, 2005. (Am. Compl. Ex. 3). Mr. Piccolo also, in a letter to the Chairman of the CFB, Frederick A.O. Schwarz, Jr., Esq., outlined his intention to "fully participate in the programs of the NYC Campaign Finance Board as are available to candidates for Mayor running in the Primaries this year." (Am. Compl. Ex. 1)(emphasis omitted).

Shortly thereafter, Mr. Piccolo sent another letter to the Board, dated July 24, 2005, outlining his several grievances associated with the process by which candidates were permitted to participate in the matching-funds program, the debate program, and the voter guide publication. These grievances were similar to the allegations in plaintiff's current pleadings, focusing on the

---

deadline for filing a certificate of acceptance or declination in 2005 was July 18 (Am. Compl. Ex. 2), the deadline for filing a designating petition was July 14, four days earlier, as designated by law. Id.; (Am. Compl. Ex. 1).

program deadlines and other eligibility criteria for the debates. The letter, however, also included more detailed allegations that the CFB was failing to carry out its mandate and had a propensity toward corruption. (See Am. Compl. Ex. 5). It appears that an attachment to this July 24 letter also included Mr. Piccolo's submission of a picture and profile for inclusion in the Voter Guide. (See id. at 5, ¶ 2).

In a letter response dated August 1, 2005, the general counsel for the CFB, Sue Ellen Dodel, Esq., explained, among other things, the reasons Mr. Piccolo was not eligible for participation in the matching-funds and debate programs and for complete inclusion in the Voter Guide. (Am. Compl. Ex. 7). Specifically, she stated that, under the N.Y.C. Administrative Code and the CFB rules, the deadline for participation in the matching-funds program was June 1, 2005, and the deadline for submitting a Voter Guide statement was June 8, 2005, and that those dates had passed. (Id.)(citing N.Y.C. Admin. Code §§ 3-703, 3-709.5; CFB Rule 10-2). She also explained that participation in the matching-funds program -- with the deadline of June 1 -- was a pre-requisite for participation in the debate program, with limited exceptions, and cited the Administrative Code's additional requirements for participation in the debate program. (Id.)

6

Mr. Piccolo and Ms. Dodel exchanged another set of letters, dated August 4 and August 5, 2005, respectively. In that correspondence, plaintiff basically repeated his grievances and Ms. Dodel reiterated her responsive explanations. (Am. Compl. Exs. 8, 9).

The Voter Guide was mailed to voters sometime around the end of August 2005 for the September primary. (See id. Ex. 3; Loprest Aff. ¶¶ 2, 59). Plaintiff's name appeared in the Voter Guide's list of primary candidates, but his picture and profile did not. (See Loprest Aff. ¶ 58 & Ex. I; Pl.'s Affirmation in Opp. to Def.'s Mot. ("Pl.'s Aff.") Ex. 2).[4]

The two mayoral debates took place on August 16 and September 7, 2005. (Am. Compl. 2; Loprest Aff. ¶ 44). Mr. Piccolo did not participate in either one or in the matching-funds program. (See Loprest Aff. ¶¶ 2, 44, 59).

The primary election took place on September 13, 2005, and Mr.

---

[4] Because of the plaintiff's status as an untutored pro se litigant, we consider as true not only the facts alleged in his pleadings and the attachments thereto, but also those alleged in his responsive papers on the motion to dismiss. See Hernandez v. Goord, 312 F. Supp. 2d 537, 542-43 (S.D.N.Y. 2004) (citing Baskerville v. Blot, 224 F. Supp. 2d 723, 728 (S.D.N.Y. 2002)); see also Gill v. Mooney, 824 F.2d 192, 195 (2d Cir. 1987).

Piccolo's name appeared on the ballot. (See Loprest Aff. ¶¶ 4, 44 & Ex.; Pl.'s Aff. Ex. 3). The plaintiff did not gain his party's nomination and was not a candidate in the 2005 general elections. (Loprest Aff. ¶ 44 n.12).

B. <u>The Complaint</u>

Based on these events, plaintiff contends that the CFB acted in contravention of the First and Fourteenth Amendments in its enforcement of those deadlines that, in effect, excluded him from participation in the programs. (Am. Compl. 3-4, ¶ 2; 5-6, ¶¶ 5-7; 9-10).[5] Somewhat more specifically, plaintiff alleges that the deadline for the Campaign Finance Program ("CFB Program") overall, and its particular effect of making him ineligible for public matching funds, "interfer[es] with the rights of voters, legitimate political parties and their member[s] to select their candidate of choice by means of the fair and equal primary process without government prejudicing that process." (<u>Id.</u> at 6, ¶ 7).

With regard to the debate program, plaintiff alleges that the

_____

[5] The amended complaint is not uniformly organized in numbered paragraphs; thus, in an attempt to avoid confusion, we cite page numbers as well as paragraph numbers, where both are available, and only the former otherwise.

deadline for participation[6] and other eligibility requirements are "arbitrary and capricious" and therefore operate as "a denial of the Equal Protection Clause and the rights of voters, political parties and their members under the Freedom of Speech Amendment." (Am. Compl. 4-5, ¶ 4). Although plaintiff does not consistently identify the program about which, at any one instance, he is articulating a specific grievance, he also alleges that the debate program's participation requirements label candidates as "serious or not, and in so doing create categories of candidates, in effect picking 'winners' and 'losers' prior to the actual vote taking place" and that this amounts to a "subversion of the right of the political party and its members to choose its own candidate for Mayor with[out] interference from a government agency." (Id. 3-4, ¶ 2).

Finally, Mr. Piccolo alleges that the deadline for submitting his photograph and profile for inclusion in the Voter Guide is also "arbitrary and capricious" because June 8 was "long before the Guide would be printed and even before [plaintiff] decided to circulate the necessary petitions to be a candidate." (Am. Compl. 5-6, ¶ 6). Thus, Mr. Piccolo charges, the deadline places unconstitutional constraints on voters' rights to "fair and

---

[6] This refers to the same deadline as for the overall CFB Program -- June 1, 2005.

adequate elections." (<u>Id.</u> 5-6, ¶ 6).

The complaint also suggests, somewhat more ambiguously and less consistently, that the program deadlines contravene New York State and City law. (<u>Id.</u> at 2; 4 ¶ 3; 6 ¶ 7). Plaintiff's central allegation in this regard appears to be that the CFB program deadlines are unlawful because they precede the deadline ordained by the New York State Election Law, and implemented by the BOE, for submitting a petition for designation as a candidate. (<u>Id.</u> at 2; 4 ¶ 3); <u>see</u> N.Y. Elec. Law § 6-158. The plaintiff does not otherwise cite any source of State or City law in his challenge to these deadlines.

Mr. Piccolo requests injunctive relief mandating his participation in the three CFB programs. (Am. Compl. 10, ¶¶ A-C). His amended complaint also seeks to enjoin the CFB from enforcing the program deadlines in future elections and seeks compensatory damages. (Am. Compl. cover page; 10, ¶ D).[7]

---

[7] Plaintiff does not characterize the requested relief with respect to future enforcement of the deadlines as either declaratory or injunctive, but we assume the latter because he demands that the CFB discontinue enforcement of the deadlines, and also seems to argue for moving the deadlines to match that of the BOE for petitions.

10

C. <u>The Motion to Dismiss</u>

The CFB argues that plaintiff's request for an injunction ordering his participation in the CFB's 2005 election programs is moot, requiring dismissal under Rule 12(b)(1) on the ground that this court lacks subject-matter jurisdiction. (Loprest Aff. ¶¶ 4, 41-44). Defendant adds that plaintiff's other requested forms of relief -- a permanent injunction and an award of damages -- rest upon the same constitutional bases and do not "obscure the fact that [Mr.] Piccolo's substantive case is moot" (id. at ¶ 4), thus apparently arguing for dismissal of the entire action pursuant to 12(b)(1).

In the alternative, the CFB argues that the amended complaint fails to state a single viable claim for relief, and the defendant therefore seeks dismissal pursuant to Federal Rule of Procedure 12(b)(6). (<u>Id.</u> at ¶¶ 4-6, 41, 46-65). As to the constitutional claims, the defendant first argues that Piccolo cannot make out a First Amendment claim because the deadlines and other program eligibility requirements that are the focus of his allegations are "reasonable, uniform, and non-discriminatory" (<u>id.</u> at 46), and then notes prior case law that found similar deadlines reasonable and only minimally burdensome on the right to vote. (<u>Id.</u> at ¶¶ 47-53). Defendant argues that this non-discriminatory uniformity also

11

demonstrates the baselessness of any proposed claim under the Equal Protection Clause of the Fourteenth Amendment. (Loprest Aff. ¶ 46).

Defendant also responds to the plaintiff's vaguely suggested allegations of violations of State and City law. The CFB argues that because the deadlines are, for the most part, created by the New York City Administrative Code, the CFB is not the appropriate party to provide the plaintiff with the relief he seeks with respect to the setting of those deadlines, a task for which responsibility rests with the legislature.[8] (Loprest Aff. at ¶ 45). The Voter Guide deadline seems necessarily an exception to this argument, as it is set by the CFB and not by the Code. (Id. ¶ 45 n.13). See N.Y.C. Charter § 1053 (authorizing board to "promulgate such rules as it deems necessary for the preparation and publication of the guide"); CFB Rule 10-02(b)(4)(i)(setting the deadline as "not later than 12 weeks prior to the primary election or such other time as prescribed by the Campaign Finance Board").

The defendant also argues that the alleged conflict between

_____

[8] We do not address the CFB's argument that it is not the proper defendant in this suit. Instead, we note that if plaintiff were to adequately plead a constitutional claim, leave to amend rather than dismissal would likely be the preferable course if addition or substitution of a party were appropriate. See Dayse v. Schuldt, 894 F.2d 170, 174 (5th Cir. 1990)("When a pro se plaintiff's suit raises a constitutional claim, but he has inadvertently sued the wrong parties, he should [be] given leave to amend to sue the appropriate party or parties.").

its policies and the laws implemented by the BOE do not reflect a violation of State law, but rather are attributable to the differing functions of, and lack of connection between, the two agencies. It suggests that because its programming obligations are distinct from the BOE's obligation to review each candidate's ballot status, the deadlines enforced by one agency are not, and should not be, required to match those enforced by the other. (Loprest Aff. at ¶¶ 14, 55 n.16, 56 n.17). This argument, then, is applicable not only to the Code-created deadlines for the matching-funds and debate programs, but also to the CFB-created deadline for submissions to the Voter Guide.

Defendant characterizes plaintiff's argument as based upon a "belie[f] that the uniform legal requirements and deadlines applied to all candidates . . . simply do not apply to him." (Id. at ¶ 3). As such, it contends, the allegations in the amended complaint fail to state any cognizable claim, whether grounded in federal, state, or local law.

D. <u>CFB Election Programs</u>

In order to aid this analysis, we briefly outline the relevant details of the CFB programs at issue. In doing so, we rely on both the affidavit submitted by defendant and the pertinent statutory

13

and regulatory provisions, of which we may take judicial notice.

The CFB was established to administer the Campaign Finance Program created by the New York City Campaign Finance Act in 1988. N.Y.C. Admin. Code §§ 3-701 to -719; N.Y.C. Charter §§ 1051-57. The CFB manages the three major components of the CFB Program: (1) the matching-funds program, N.Y.C. Charter § 1052; N.Y.C. Admin. Code §§ 3-703, 3-709; (2) the mandatory debate program, N.Y.C. Admin. Code § 3-709.5; and (3) the publication of the Voter Guide. N.Y.C. Charter §§ 1052(b) & 1053. (See Loprest Aff. ¶ 9).

The matching-funds program pays participating candidates public matching funds based on a variety of disclosures made during their campaigns that demonstrate their eligibility for such funds. To be considered a full participant in the CFB Program and eligible for certain benefits of participation, prospective candidates must file a certification form by June 1 during the relevant election year. (Am. Compl. 6, ¶ 7); N.Y.C. Admin. Code § 3-703(1)(c).[9]

_____

[9] Both Program participants and non-participants are required to make various disclosures to the CFB. See N.Y.C. Admin. Code § 3-703(6). Because these disclosures —- and other responsibilities of prospective candidates prescribed by the Code —- are not at issue in this case, we do not outline them in detail. We note the universality of some disclosure requirements only to indicate that a candidate's having met the June 1 deadline does not guarantee all privileges of participation in the matching-funds program; even participants in the overall CFB Program will be denied matching funds if they do not meet other eligibility criteria and abide by various other requirements

Participation in the CFB Program as a whole is one prerequisite to being included in both the matching-funds program and the debate program.[10] To participate in both the matching-funds program and the debate program, a candidate must also demonstrate, among other things, that he has reached threshold levels of monetary support. Id. at §§ 3-703(5)(b)(i), 3-709.5(2)(a)(i).

A candidate who misses the June 1 deadline to file a certification form with the CFB cannot participate in the matching-funds program. Id. § 3-703(1)(c) & (4).[11] A candidate who misses the June 1 deadline -- and is therefore a "non-participant" of the Program --  may still, however, participate in the debates by sponsor invitation if that candidate meets certain criteria

---

specified by the Code. Id. Mr. Piccolo does not argue that he met any of these other requirements.

[10] In fact, debate program participation is not voluntary for candidates receiving public matching funds. The Program participants who meet certain other requirements of N.Y.C. Admin. Code § 3-709.5, including terms of agreements established between the CFB and debate sponsors, must participate in the debates.

[11] The Code does allow for the filing of a certification form after the deadline and "on or before the seventh day after the occurrence of an extraordinary circumstance in an election, as declared by the campaign finance board . . . ." N.Y.C. Admin. Code § 3-703(1)(c)(ii). The Code also specifies that "an 'extraordinary circumstance' shall include the death of a candidate in the election, the resignation or removal of the person holding the office sought, and the submission to the board of a written declaration by an officeholder that terminates his or her campaign for reelection." Id. Mr. Piccolo does not suggest that the exception applies to his filing.

specified in the Code as well as additional "non-partisan, objective, and non-discriminatory criteria" that the sponsor and CFB agree upon.[12] N.Y.C. Admin. Code § 3-709.5(5)(b)(ii). (See also Am. Compl. Ex. 4 (CFB Press Release announcing debate sponsors)).

The additional requirements agreed upon by the CFB and the sponsors of the 2005 mayoral primary debates were as follows: For the first debate, all participants must have, prior to that debate, polled at five percent or higher in selected polls. (Loprest Aff. ¶ 22). For the second primary debate, statutorily limited to "leading contenders," N.Y.C. Admin. Code § 3-709.5(1)(d), participants were required to have raised or spent a certain amount of money and to have polled at ten percent or higher in the selected polls. (Loprest Aff. ¶ 22).

Unlike with the matching-funds and debate programs, candidates do not have to be CFB Program participants in order to be included

---

[12] Aside from "non-participants" and "participants," the Administrative Code recognizes a third category of "limited participants" in the Program. N.Y.C. Admin. Code § 3-718. These "limited participants" must file CFB-created certification forms by the same June 1 deadline applicable to participants, id. at § 3-718 (1)(a)(iii)(B), and are subject to the same debate-eligibility requirements as participants. Id. at § 3-709.5. For purposes of this outline of the programs, the distinction between these two groups has no significance –– Mr. Piccolo did not meet any of the requirements for either group, and he does not argue that he belonged in either group. All participants and limited participants, therefore, will simply be referred to as Program "participants."

in the Voter Guide. Profiles of all candidates on the ballot will be included in the Voter Guide if they submit a candidate statement -- for the 2005 primary election this consisted of a photograph and profile -- by a CFB-created deadline "not later than 12 weeks prior to the primary election." CFB Rule 10-2 (4)(I). In 2005, the CFB set this deadline at June 8. (Am. Compl. 5, ¶ 6; Loprest Aff. at ¶ 25).

In order to be included in the 2005 Voter Guide for the primary election, candidates were required to submit this information electronically. CFB Rule 10-2; (Loprest Aff. ¶ 25 n.6 & Ex. D). Even though the candidate photographs and profiles were submitted in June, the Voter Guide includes only candidates who are on the ballot, N.Y.C. Charter §§ 1052(b), 1053, and therefore the Voter Guide for the 2005 primary was not published and distributed until around the end of August of that year. (Am. Compl. Ex. 3; Loprest Aff. ¶ 58). The Voter Guide lists all candidates who are on the ballot, even if their profiles and photographs are not included. (Id. at 58).

II. Analysis

Defendant moves to dismiss on 12(b)(1) and 12(b)(6) grounds. We consider the Rule 12(b)(1) argument first because "if [we] must dismiss the complaint for lack of subject matter jurisdiction, the

17

accompanying defenses and objections become moot and do not need to be determined.'" <u>United States ex re Kreindler & Kreindler v. United Technologies Corp.</u>, 985 F.2d 1148, 1155-56 (2d Cir. 1993)(quoting 5 C. Wright and A. Miller, Federal Practice and Procedure, § 1350, p. 548 (1969)). <u>See also</u> <u>Bell v. Hood</u>, 327 U.S. 678, 682 (1946); <u>Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n</u>, 896 F.2d 674, 678 (2d Cir. 1990).


A. Rule 12(b)(1)


"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." <u>Makarova</u>, 201 F.3d at 113 (citing Fed. R. Civ. P. 12(b)(1)). "The mootness doctrine, which is mandated by the 'case or controversy' requirement of Article III of the United States Constitution, requires that federal courts may not adjudicate matters that no longer present an actual dispute between parties." <u>Id.</u> (citing <u>Lewis v. Cont'l Bank Corp.</u>, 494 U.S. 472, 477-78 (1990)). A case is moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome," <u>Catanzano v. Wing</u>, 277 F.3d 99, 107 (2d Cir. 2001)(quoting <u>Powell v. McCormack</u>, 395 U.S. 486, 496 (1969)), and the court can no longer provide any relief that could effectually redress the plaintiff's claimed

injuries. In re Kurtzman, 194 F.3d 54, 58 (2d Cir. 1999).

There is no longer a live controversy between the parties with respect to participation in the 2005 CFB programs, since those programs were long ago completed and the election conducted. See Freedom Party of New York v. New York State Bd. of Elections, 77 F.3d 660, 662 (2d Cir. 1996)(declining to exercise appellate review of a preliminary injunction where controversy between the parties centered on their respective rights to use a certain party name in a past election). Hence the court clearly cannot grant injunctive relief requiring Mr. Piccolo's inclusion in those programs. See Church of Scientology of California v. United States, 506 U.S. 9, 11 (1992)("[I]f an event occurs while a case is pending on appeal that makes it impossible for the court to grant 'any effectual relief whatever' to a prevailing party, the appeal must be dismissed.")(quoting Mills v. Green, 159 U.S. 651, 653 (1895)).[13]

---

[13] Of course the "passage of an election does not necessarily render an election-related case moot"; rather, each case must be assessed for whether the challenged action "is capable of repetition, yet evading review," and would thus be an appropriate subject for analysis under this exception to the mootness doctrine. Freedom Party, 77 F.3d at 662 (quoting, inter alia, Storer v. Brown, 415 U.S. 724, 737 n.8 (1974)). In election-related cases, courts will look at whether the alleged violations "will persist in future elections, and within a time frame too short to allow resolution through litigation." Lerman v. Board of Elections in City of New York, 232 F.3d 135, 141 (2d Cir. 2000)(quoting Fulani v. League of Women Voters Educ. Fund, 882 F.2d 621, 628 (2d Cir. 1989)).

Where, as here, plaintiff pleads additional live claims, we

Mr. Piccolo, however, does not seek solely to participate in the 2005 election-related programs. He also asks to enjoin the operation of these deadlines in future elections and requests as well an award of compensatory damages for injuries to his campaign. A case does not become moot in its entirety because one issue or some issues and remedies of many are moot; rather, the viability of one claim for relief satisfies the constitutional jurisdictional requirement of a live case or controversy. Powell v. McCormack, 395 U.S. 486, 496-97, 496 n.8 (1969). See, e.g., Young-Flynn v. Wright, 2007 WL 241332, at *10 (S.D.N.Y. Jan. 26, 2007)(dismissing claim for preliminary injunction on 12(b)(1) motion as moot and considering other claims on 12(b)(6) motion).

Thus, we recommend dismissal of Mr. Piccolo's claim for

---

need not engage in this analysis. We do note, however, that Mr. Piccolo's pursuit, and the court's resolution of, two orders to show cause prior to his filing of his amended complaint may tend to demonstrate that his claim for inclusion in the 2005 CFB Program did not evade timely review.

Mr. Piccolo may have also had another avenue of recourse that would have likely resulted in a relatively speedy resolution -- presumably, he could have pursued an Article 78 proceeding in state court for review of his exclusion from the CFB's programs. (See, e.g., Loprest Aff. Ex. H, Garson v. New York City Campaign Finance Board, Index No. 43576/91 (N.Y. Sup. Ct. August 8, 1991)(city council primary candidate's Article 78 challenge to his exclusion from the CFB Program resolved by the state court approximately six days after agency's decision)).

injective relief that would require his participation in the 2005 CFB Program as moot, but we analyze plaintiff's other claims for relief -- seeking a permanent injunction and an award of compensatory damages -- under the framework of Rule 12(b)(6).


    B. <u>Rule 12(b)(6)</u>


In assessing the legal adequacy of a pleading when challenged under Fed. R. Civ. P. 12(b)(6), we must assume the truth of the well-pled factual allegations of the complaint and must draw all reasonable inferences against the movant. <u>See</u>, <u>e.g</u>, <u>Woodford v. Community Action Agency of Greene County</u>, 239 F.3d 517, 526 (2d Cir. 2001); <u>Still v. DeBuono</u>, 101 F.3d 888, 891 (2d Cir. 1996); <u>Pinnacle Consultants, Ltd. v. Leucadia Nat'l Corp.</u>, 101 F.3d 900, 903 (2d Cir. 1996). "The fundamental issue at the dismissal stage 'is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims.'" <u>Phelps v. Kapnolas</u>, 308 F.3d 180, 184-85 (2d Cir. 2002)(quoting <u>Chance v. Armstrong</u>, 143 F.3d 698, 701 (2d Cir. 1998)). Thus, even though "'it may appear on the face of the pleading that a recovery is very remote and unlikely . . . that is not the test.'" <u>Chance</u>, 143 F.3d at 701 (quoting <u>Branham v. Meachum</u>, 77 F.3d 626, 628 (2d Cir. 1996)). If a claim is implausible on its face, however, the court may require "a pleader

to amplify [that] claim with some factual allegations," Iqbal v. Hasty, 490 F.3d 143, 157 (2d Cir. 2007), if it is to survive the motion to dismiss.[14]

The court's obligation to parse the complaint for any arguably available legal theory is particularly acute when the pleading has been drafted by an untutored pro se plaintiff. See e.g., Fleming v. United States, 146 F.3d 88, 90 (2d Cir. 1998); Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir. 1994). Furthermore, if a pro se complaint is found legally deficient, the court should afford the plaintiff a reasonable opportunity to amend his pleadings if "a liberal reading of the complaint gives any indication that a valid claim might be stated." Branum v. Clark, 927 F.2d 698, 705 (2d Cir. 1991). See also Mian v. Donaldson, Lufkin & Jenrette Sec., 7 F.3d 1085, 1087 (2d Cir. 1993)(giving plaintiff who failed to plead essential elements of civil rights claim an opportunity to amend pleadings).

---

[14] Iqbal recognized the abrogation of Conley v. Gibson, 355 U.S. 41, 45-46 (1957), by Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1969 (2007), insofar as Conley mandated that a claim survive a 12(b)(6) motion "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Iqbal, 490 F.3d at 155 (quoting Bell Atlantic, 127 S. Ct. at 1968). Iqbal applied a "plausibility standard" to determine the adequacy of plaintiff's pleading: Where the claim is at least "plausible," the pleading need not include "additional subsidiary facts" to support that claim. Id. at 155-58, 166.

Notwithstanding the liberality of these standards, plaintiff's current pleading is deficient in seeking to assert claims against the CFB. We therefore recommend granting dismissal for the reasons discussed below.

1. What are the Rights at Issue?

Plaintiff's complaint alludes to several different First and Fourteenth Amendments protections, broadly including his right to equal protection, his and voters' associational rights, voting rights more generally, and his First Amendment speech rights. We briefly identify the proper characterization of these rights in order to analyze Mr. Piccolo's claims.

With regard to a possible equal-protection challenge, the fundamental-rights strand of equal protection has been held to protect voters' rights, Anderson v. Celebrezze, 460 U.S. 780, 787 n.7 (1983), and plaintiff's equal protection language could simply be interpreted as pleading allegations of voters' rights violations rather than a distinct allegation of an equal-protection violation. In our obligation to interpret the pro so plaintiff's claims as liberally as possible, however, we will first engage in a separate equal-protection analysis based on traditional equal-protection principles before discussing plaintiff's claims based on his and his party members' associational, voting and speech rights.

23

Next, Mr. Piccolo's First and Fourteenth Amendment claims regarding the burdens on his candidacy and voters' rights more generally require some further definition before analysis. The Supreme Court long ago acknowledged that burdens on candidacy -- usually in the context of ballot restrictions -- implicate overlapping rights: "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." Williams v. Rhodes, 393 U.S. 23, 30-31 (1968). In election contexts, the associational rights of candidates and voters are usually implicated or urged where a law burdens a minor or third party, or its candidate, in such a way that it restricts the candidate or the party from participation in some component of the election process, whether it be the ballot itself, see, e.g., Timmons v. Twin Cities Area New Party, 520 U.S. 351, 359 (1997) (upholding Minnesota's fusion ban against minor party's challenge and stating "[t]hat a particular individual may not appear on the ballot as a particular party's candidate does not severely burden that party's associational rights"), or programs related to the election but not directly involving ballot access. See, e.g., Johnson v. FCC, 829 F.2d 157, 164-66 (D.C. Cir. 1987)(rejecting minor party candidate's challenge to exclusion from televised debate). These instances implicate the associational rights of a party's candidate and a party in particular because exclusions

24

affect the party's ability to organize and choose a candidate.

Although Mr. Piccolo alleges intrusions upon associational rights very generally, it is difficult to discern how the associational rights of Mr. Piccolo or his party as an organization are implicated by any of the challenged deadlines or debate-eligibility criteria. (See Compl. 3-4 ¶ 2, 7-8 (citing California Democratic Party v. Jones, 530 U.S. 567 (2000); Eu v. San Francisco County Democratic Central Comm., 489 U.S. 214 (1989)). He does not allege that he or his party -- the Democratic Party -- was excluded from the ballot, that his exclusion from the CFB programs had anything whatsoever to do with his party affiliation, or that the exclusions jeopardized the prospects of his party's nominee in the overall election.[15]

Additionally, the cases plaintiff cites that discuss First Amendment associational rights, Jones and Eu, are inapposite. Plaintiff does not allege, for example, that the deadlines and

_____

[15] Any such claim with regard to the primary debates, of course, would be illogical because, unlike in other debate cases, see, e.g., Ark. Educ. Television Comm'n v. Forbes, 523 U.S. 666, 682-83 (1998)(independent candidate's First Amendment challenge to state-owned broadcaster's decision to exclude him from major-party candidate debate); Johnson, 829 F.2d at 164-66 (minor-party presidential and vice-presidential candidates challenge exclusion from televised debate under Communications Act and First Amendment), all candidates in the challenged primary debates shared the same party affiliation.

debate criteria had any effect whatsoever on his party's ability to choose its preferred rules for participating in the primary. See, e.g., Clingman v. Beaver, 544 U.S. 581, 588-89 (2005)(holding that Oklahoma's "semiclosed primary system," which did not allow party members to vote in another party's primary, imposed only a minor burden on associational rights); California Democratic Party v. Jones, 530 U.S. 567, 577-78, 586 (2000)(holding that California's blanket primary allowing voters to vote for any candidate regardless of voter or candidate affiliation impermissibly burdened associational rights); Tashjian v. Republican Party of Conn., 479 U.S. 208, 229 (1986)(finding that "closed primary system" that did not allow parties to permit independent voters to vote in their primaries impermissibly burdened associational rights). He also does not suggest that the challenged laws and rules otherwise obstructed the internal workings of his party. See, e.g., Eu, 489 U.S. at 230-31 (holding that California law regulating internal party affairs, such as governance structure, imposed an impermissible burden on associational rights). See also Timmons, 520 U.S. at 358 ("The First Amendment protects the right of citizens to associate and to form political parties for the advancement of common political goals and ideas."; "[P]olitical parties' government, structure, and activities enjoy constitutional protection.")(citations omitted).

26

Therefore, neither Mr. Piccolo's nor his party's associational rights are implicated by the CFB Program deadlines. Nevertheless, the deadlines, if indeed considered burdens on candidacy, do affect primary voters. The connection between burdens on candidacy and the effects of those burdens on voters' rights, including those to associate through identifying and favoring a candidate of choice, and thus to generally "cast their vote effectively," Rhodes, 393 U.S. at 30-31, is well-recognized. The portion of our analysis dealing with associational rights and voters' rights more generally will hence focus on whether Mr. Piccolo has adequately pled violations of voters' rights, rather than violations of his own associational rights as a candidate or party member.

Mr. Piccolo has standing to assert the constitutional rights of voters in this context because "[a] candidate for public office . . . is so closely related to and dependent upon those who wish to vote for him and his litigation will so vitally affect [voters'] rights . . . ." Mancuso v. Taft, 476 F.2d 187, 190 (1st Cir. 1975)(citing inter alia Bullock v. Carter, 205 U.S. 134 (1972)). Although, as with other burdens on candidacy, "[t]he initial and direct impact" of the CFB Program deadlines in this case are "felt by aspirants for office, rather than voters, . . . the rights of voters and the rights of candidates do not lend themselves to neat separation." Bullock, 205 U.S. at 143. See also, e.g., Pennsylvania

27

<u>Psychiatric Soc. v. Green Spring Health Servs., Inc.</u>, 280 F.3d 278,
288 n.10 (3rd Cir. 2002)(noting candidate's ability to raise
voters' constitutional rights as one of several instances in which
third-party standing is commonly recognized)(citing <u>Mancuso</u>, 476
F.2d at 187).

Finally, from what we can make out in the complaint, Mr.
Piccolo's challenge to the debate-eligibility criteria in
particular differs from his assertions concerning the program-
participation -- including debate -- deadlines. In this regard, he
seems to allege a violation of his own First Amendment rights
related to free speech, rather than the associational rights of his
party or party members, or voters' rights more generally. We
analyze his claim with that understanding. See Forbes, 523 U.S. at
669 (public broadcaster's application of popular-support criteria
that effectively excluded some candidates from debates was subject
to First Amendment forum-doctrine analysis).

In sum, we will first discuss Mr. Piccolo's equal-protection
challenge to the CFB Program deadlines and debate criteria. Then we
will analyze whether Mr. Piccolo's challenge to all three of the
election-related programming deadlines adequately alleges
violations of voters' rights. Last, we address Mr. Piccolo's
allegation that the debate-eligibility criteria offend his First

Amendment speech rights.

2. <u>Equal Protection</u>

In order to analyze Mr. Piccolo's complaint as asserting a distinct equal-protection challenge to the CFB Program deadlines and debate criteria, we assume plaintiff means to allege that the deadlines are constitutionally unsound because they, in some unspecified manner, treat him inequitably relative to other candidates. The complaint, however, alleges absolutely no facts to support such a notion.

To state an equal-protection claim, Mr. Piccolo must "allege that a government actor intentionally discriminated against [him] on the basis of [a protected classification.]" <u>Hayden v. County of Nassau</u>, 180 F.3d 42, 48 (2d Cir. 1999)("race, national origin or gender"). Instead, Mr. Piccolo alleges that the laws and policies governing program participation violate equal-protection principles because they resulted in his exclusion when he failed to meet their requirements. (<u>See</u>, <u>e.g.</u>, Am. Compl. 5, ¶ 6).

Facially neutral laws or policies -- such as the deadlines and debate criteria challenged in this case -- are vulnerable to an equal-protection challenge only if they are "applied in a discriminatory fashion [or are] motivated by discriminatory animus

[and] result in a discriminatory effect."[16] <u>Id.</u> <u>See</u> <u>also</u> <u>Rivera-Powell v. New York City Board of Elections</u>, 470 F.3d 458, 470 (2d Cir. 2006)(dismissing allegation of equal-protection violation where plaintiff failed to suggest or substantiate such a showing). Conclusory allegations of intentional discrimination will not suffice to sustain a claim on a motion to dismiss, <u>id.</u>, and the mere recitation of the words "equal protection" does not change that result.

Although plaintiff invokes the Equal Protection Clause of the Fourteenth Amendment in his amended complaint as a basis for relief (Am. Compl. 1, ¶ 1; 5-6, ¶¶ 5-7), he does not allege discriminatory actions against him or against a group of which he is a member. In short, Mr. Piccolo fails to make even conclusory allegations of any equal-protection violation. Instead, he seems to concede, at least implicitly, that the deadlines with respect to each of the programs

_____

[16] The amended complaint repeatedly asserts that the laws and rule setting the relevant deadlines are "arbitrary and capricious," and are therefore violative of the Equal Protection Clause and the First and Fourteenth Amendments. Such language could be seen as suggestive of a selective-enforcement claim under the Equal Protection Clause, which –– to be adequately pled –– must at least allege that Mr. Piccolo was "treated differently from other similarly situated individuals." <u>Harlen Associates v. Incorporated Village of Mineola</u>, 273 F.3d 494, 499 (2d Cir. 2001). <u>See</u> <u>also</u> <u>Terio v. Johann</u>, 2006 WL 2819659, at *7 (S.D.N.Y. Sept. 29, 2006); <u>Jackson v. Roslyn Bd. of Educ.</u>, 438 F. Supp. 2d 49, 55 (E.D.N.Y. 2006). Mr. Piccolo, however, does not suggest that he was treated differently from other candidates who missed the deadlines, and his pleadings do not suggest that the deadlines were not applied uniformly.

do not distinguish, facially or in effect, between different groups of prospective candidates.

The only classification discernable in this scenario is the classification created by candidates' actions in relation to the deadlines themselves, creating groups of those who meet them and those who do not. This plainly does not implicate plaintiff's rights under the Equal Protection Clause. Cf. Rogers v. New York City Campaign Finance Bd., 988 F. Supp. 409, 413 (S.D.N.Y. 1997)("[T]here is no allegation in the Complaint that the deadline has a discriminatory purpose or effect beyond the fact that it 'discriminates' against those candidates who miss it.").

Therefore, even given our liberal interpretation of this pro se plaintiff's complaint, we must recommend that Mr. Piccolo's claim under the Equal Protection Clause -- the contours of which are not even vaguely discernable -- be dismissed for failure to state a claim.

3. Burden on Voters' Rights

If a statute or regulation imposes severe burdens on voters' rights, it must be narrowly tailored and advance a compelling state interest. Timmons, 520 U.S. at 351. Where the burden is less than

31

severe, however, "important regulatory interests will usually be
enough to justify reasonable, nondiscriminatory restrictions." Id.
(applying the test to "antifusion laws")(quoting Burdick v.
Takushi, 504 U.S. 428, 434 (1992)). See also Rogers, 988 F. Supp.
at 412-13 (applying test to CFB Program deadline).

Mr. Piccolo's exclusion from the three CFB programs does
implicate voters' rights, if indirectly. See Rogers, 988 F. Supp.
at 412 ("[Plaintiff's] exclusion from the debates, and his
subsequently reduced ability to make himself known to voters,
implicated [voters' basic constitutional rights], albeit in a
tangential manner."). "[L]aws that affect candidates always have at
least some theoretical, correlative effect on voters." Anderson,
460 U.S. at 786 (1983)(quoting Bullock v. Carter, 405 U.S. 134, 142
(1972)). Every effect on or implication of these rights, however,
does not amount to an unconstitutional burden.[17] Instead, we must
weigh the burden that each challenged deadline imposes on the
constitutional rights of candidates and voters, and determine

_____

[17] Mr. Piccolo seems to be arguing that every election-
related deadline must undergo and survive strict scrutiny. (See,
e.g., Am. Compl. 6, ¶ 8). This is simply not the case. Even
direct restrictions on the manner in which votes are cast will
not automatically trigger heightened scrutiny without a
determination that the burden on voters' rights is severe. "[T]o
subject every voting regulation to strict scrutiny and to require
that the regulation be narrowly tailored to advance a compelling
state interest . . . would tie the hands of States seeking to
assure that elections are operated equitably and efficiently."
Burdick, 504 U.S. at 434.

whether that burden is justified by important state interests.

a. The June 1 CFB Program Deadline

First, Mr. Piccolo challenges the deadline of June 1 for the CFB Program as a whole, citing the effects that the deadline and his consequent exclusion from the program during the 2005 election year had on his ability to compete in the election. Mr. Piccolo's central contention is that his ineligibility for public funds interfered with the rights of voters by "prejudicing" the "primary process." (Am. Compl. 6, ¶ 7). He adds that his non-participation affected voter choice because it gave the false impression that he was unwilling to participate in the CFB Program. (Id. at 6-7, ¶ 8). Although it is conceivable that non-participation in the program could generate negative publicity for a candidate, this does not support plaintiff's suggestion that the deadline severely burdens voters' rights.

The District Court rejected a very similar challenge to the CFB program deadline in Rogers. There, much like here, the plaintiff timely submitted the forms required for inclusion in the 1997 Democratic primary ballot for the mayoral election but missed

the deadline to participate in the CFB Program.[18] Thus, the plaintiff was not eligible for matching funds nor required to participate in the debate program, and the sponsors apparently did not invite his participation. Rogers, 988 F. Supp. at 410. He alleged that his exclusion from the program, and from the debates in particular, resulted in his "reduced ability to make himself known to voters" and violated First and Fourteenth Amendment protections. Id. The plaintiff sought to enjoin the primary election, and the defendants made a motion to dismiss.[19] Id. at 410, 412.

The District Court found that the rights to associate for the advancement of political beliefs and to cast votes effectively were implicated, "albeit tangential[ly]," by Rogers' exclusion from the program. Id. at 412. Emphasizing that this was not a ballot restriction case and that voters' opportunity to vote for Rogers in the primary was unaffected, the court concluded that the deadline

---

[18] At that time, the relevant deadline for participation in the CFB Program was April 30. Rogers, 988 F. Supp. at 410.

[19] The plaintiff in Rogers also alleged violations of the Voting Rights Act of 1965, 42 U.S.C. §§ 1971-1974(e), and the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, neither of which are at issue here. Rogers, 988 F. Supp. at 410. We note as a point of interest that Mr. Piccolo seems to have served as a non-lawyer representative for the pro se plaintiff in Rogers. See id. at 410-11 n.1. We decline, however, defendant's urging to use Mr. Piccolo's presumed notice of the main program deadline as a basis for any part of our conclusions.

34

"impose[d] an extremely minor burden on the right to vote." Id. at 413.

Because the court found that the deadline imposed only a minor burden on voting rights, it assessed whether the deadline was reasonable and non-discriminatory, as well as whether it served an important government purpose. Citing circuit precedent that "applied a less exacting review to voting restrictions far more onerous," Rogers, 488 F. Supp. at 413 (citing Schulz v. Williams, 44 F.3d 48, 56-57 (2d Cir. 1994))(internal quotation marks omitted), the court held that the deadline was reasonable and non-discriminatory, and that it served important regulatory interests, namely, the orderly monitoring of campaign funding by the CFB Program. Rogers, 988 F. Supp. at 413.

The Eastern District has also addressed the constitutionality of the CFB Program deadline. In Ostrom v. O'Hare, 160 F. Supp. 2d 486 (E.D.N.Y. 2001), the plaintiffs were particularly concerned with eligibility for public matching funds, and the court faced a seemingly more complicated First Amendment question: whether the deadline for participation in the CFB Program "violated the free speech and associational rights of the plaintiffs and the Green Party voters by favoring candidates from established parties over those from 'new parties.'" Id. at 493. The Ostrom plaintiffs argued

that where new parties can form and participate in the election but still be precluded from participation in the matching-funds program because of having missed the independent and earlier CFB deadline, a "grossly uneven playing field" is created where older parties are bolstered by the receipt of public funds but "new parties" are denied such monetary support. Id.[20]

In its assessment of the burden imposed by the deadline, Ostrom questioned whether "the lack of public funding is a burden on First Amendment rights of voters at all." Id. (citing Buckley v. Valeo, 424 U.S. 1, 94 (1976)("the denial of public financing to some . . . candidates is not restrictive of voters' rights and less restrictive of candidates' [than restrictions on ballot access]")). The court noted that the ballot was unaffected by the deadline -- the party's candidate appeared on the ballot. In rejecting the plaintiff's claim, Ostrom stated that to call the deadline into question would "render every uniformly imposed deadline suspect with respect to 'new parties.'" Ostrom, 160 F. Supp. at 494.

_____

[20] The plaintiffs in Ostrom faced a different deadline for submitting petitions to the BOE -- "under state guidelines, a new party could form and nominate a candidate as late as September of the election year." See Ostrom, 160 F. Supp. at 493. If anything, this difference in factual context further supports our recommendation. Mr. Piccolo urges that the gap between the deadlines he faced offends voters' rights, but the discrepancy between the deadlines in Ostrom was larger, not to mention the fact that associational rights not implicated here were plainly in play in Ostrom.

In line with Rogers and Ostrom, we conclude that the CFB Program deadline imposes a minimal burden on candidates' and correlative voters' rights. Candidates who miss the CFB deadline are not excluded from the ballot. See Rogers, 988 F. Supp. at 413 (burden "extremely minor" where plaintiff did not allege he was denied access to the ballot); Ostrom, 160 F. Supp. at 494 (burden not severe where regulations did not prevent access to the ballot). Indeed, ineligibility for the CFB programs -- including campaign funding -- should have no effect on the likelihood of getting on the ballot. Rather, the causal relationship is the reverse. By law, only candidates on the ballot receive CFB funds. Thus, the absence of public funding plays no role in a candidate's ability to bankroll his petition campaign.

Furthermore, the Supreme Court and our Circuit Court have found that far more restrictive laws than those at issue here impose only minimal burdens on constitutional rights. See, e.g., Timmons, 520 U.S. at 359 (upholding Minnesota's fusion ban and stating, "[t]hat a particular individual may not appear on the ballot as a particular party's candidate does not severely burden that party's associational rights"); Burdick, 504 U.S. at 437-39 ("[Hawaii's] ban on write-in voting imposes only a limited burden on voters' rights to make free choices and to associate politically through the vote."); Schulz v. Williams, 44 F.3d 48, 57 (2d Cir.

1994)(finding that New York Election Law requiring that independent nominating petitions indicate each signer's election district, assembly district, or ward in order to be valid amounted to only a "slight burden" on voters' rights). The Supreme Court has found that only far more stringent rules, substantially limiting the ability of a candidate to get on the ballot, constitute a significant burden on voting and related rights. See, e.g., Anderson, 460 U.S. at 786-788 (finding that early filing deadlines for independent candidates make it more difficult for them to get on the ballot and unconstitutionally burden voting and associational rights); Bullock, 405 U.S. at 149 (holding Texas law placed an unconstitutional burden on the right to vote "[b]y requiring candidates to shoulder the costs of conducting primary elections through filing fees and by providing no reasonable alternative means of access to the ballot"); Rhodes, 393 U.S. at 31 (finding restrictive Ohio election laws resulting in exclusion of all except two main parties from the ballot to be a substantial burden on the rights to vote and associate).

Because the CFB deadline is only minimally burdensome, it is justified if it is a "reasonable, non-discriminatory restriction[]" that serves "important regulatory interests." Timmons, 520 U.S. at 358. It plainly meets this test.

First, the overarching goal of regulating campaign contributions to promote fairness and prevent corruption in elections is an important government interest. See Rogers, 988 F. Supp. at 413 (citing California v. Med. Assoc. v. Federal Election Comm'n, 453 U.S. 182, 197-99 (1981)). Second, Mr. Piccolo does not allege that the 2005 deadline was facially discriminatory or was applied in a discriminatory fashion, and the facts alleged do not give rise to any such suggestion. In addition, we note that the law in fact requires that in order to receive matching funds, every candidate must abide by the deadline as well as by several other CFB Program requirements, including supplying periodic disclosure statements, limiting single-contributor as well as campaign-spending totals, responding to CFB information and document requests, and participating in an extensive audit to verify CFB Program compliance. N.Y.C. Admin. Code § 3-703. As such, the benefits of the matching-funds program do not flow solely from filing the certification form by the June 1 deadline, and Mr. Piccolo does not allege that he performed or had the ability to perform any of the other responsibilities outlined by the provisions.

As for reasonableness, the defendant argues that the June 1 deadline allows just enough time for the CFB to complete the necessary audit and ensure compliance with the CFB Program before

fund distributions. (Loprest Aff. ¶ 52). In fact, it seems clear that the later the deadline, the less likely the program is to be effective in achieving and ensuring the important goal of participant compliance. See Rogers, 988 F. Supp. at 413 (noting that "[the] program would be useless without a deadline for admission fairly early in the campaign season: Otherwise, candidates' incentives to comply with the program's restrictions would be dramatically reduced.").

Mr. Piccolo argues that the discrepancy between the CFB deadline and the BOE petition-submission deadline is problematic, yet he offers no reason why the sharing of the same deadline for both programs would be constitutionally mandated or even preferable.[21] Indeed, the June 1, 2005 deadline is a month later than the deadline found reasonable in Rogers. The CFB performs many tasks related to the matching-funds program in order to audit campaigns and ensure compliance, while shouldering the important responsibility of doling out public funds. Mr. Piccolo does not allege facts that suggest the comparatively later deadline challenged here is unreasonable, especially given the many

---

[21] It would seem that the later deadline for BOE petition submissions is designed to give prospective candidates a longer period of time in which to decide whether they will run and to collect signatures. Mr. Piccolo's argument would equally justify moving the BOE deadline up to match that of the CFB -- a seemingly more burdensome option because of its effects on actual ballot access.

responsibilities involved in administering the CFB program. Furthermore, even if a later deadline could conceivably serve the same interests more efficiently than the June 1, 2005 deadline, minimally burdensome election laws do not have to embody the best and most effective methodologies in order to be deemed reasonable. Rogers, 988 F. Supp. at 413 (citing Burson v. Freeman, 504 U.S. 191, 210 (1992)).

We conclude that Mr. Piccolo's allegations that the CFB Program deadline impermissibly burdens voters' rights fails to state a claim.

b. The Debate Participation Deadline

The June 1 CFB Program deadline also functions as the deadline for becoming eligible to participate in the CFB-administered debate program. In an effort to demonstrate that the deadline -- which effectively excluded plaintiff from the initial eligibility pool for participation in the debates -- amounted to a significant burden on voters' rights, Mr. Piccolo implies that participation in the debates necessarily communicates to voters that the candidate is a serious contender, and that the absence of a candidate -- presumably for any reason -- suggests the opposite, thus interfering with voters' selection processes. For this reasons, Mr. Piccolo challenges both the deadline and the other eligibility

41

criteria of the debate program.[22]

Curing the problem that plaintiff's challenge to the debate-participation deadline targets -- the exclusion of candidates who simply fail to meet a uniform deadline -- would seemingly necessitate eliminating the deadline as well as other eligibility criteria set by the Code, thus leading to the inclusion of every mayoral hopeful in the debates. We gather that Mr. Piccolo, by again using the term "arbitrary" to describe the debate-participation deadline, challenges the necessity of having the debate program share the deadline for participation in the overall CFB Program. Mr. Piccolo does not otherwise explain his use of this terminology or allege any facts that import further meaning into it.

In assessing whether this deadline burdens voters' rights and to what degree, we need not stray far from our analysis of the CFB Program deadline as a whole: the deadline is minimally burdensome, if burdensome at all. In Rogers, the plaintiff was most concerned about his exclusion from the debates, and the effects of that

---

[22] Mr. Piccolo's claims about the debate criteria, as distinct from his claims about the debate-participation deadline, seem to allege that those criteria mainly offend his First Amendment speech rights, rather than voters' rights more generally. Thus, Mr. Piccolo's claim with regard to the constitutionality of the debate criteria is discussed separately in this report. See infra pp. 50-57.

particular exclusion on his ability to compete against other
candidates. See Rogers, 988 F. Supp. at 413. The court, however,
did not view exclusion from the debates because of a candidate's
failure to meet the CFB Program deadline as a meaningful burden on
voters' rights; instead, the court emphasized that because it did
not affect the plaintiff's access to the ballot, "the deadline did
not deny voters the opportunity to vote for him." Id. (citing
Timmons, 520 U.S. at 362).

Insofar as Mr. Piccolo alleges that his exclusion from the
debate program more heavily impacted voters than his exclusion from
the matching-funds program, we agree with Rogers that it only
imposed a minimal burden -- if any -- on voters' rights. This point
is well-illustrated in Johnson v. FCC, 829 F.2d 157 (D.C. Cir.
1987), where minor-party candidates contended that "their exclusion
from the debates effectively excluded them from the ballot and
denied voters sympathetic to their cause their First Amendment
right to associate through the election and to cast their votes
effectively for the candidate of their choice." Id. at 164. The
D.C. Circuit Court rejected that contention, concluding that
"voters were not hindered in their ability to cast their votes for
petitioners or otherwise take part in the electoral process merely
by virtue of petitioners' exclusion from the televised debates,"
that exclusion from the debates was not comparable to restrictions

43

on the ballot, and that "[t]he exclusion . . . did not prevent [candidates] from waging an effective campaign or deny voters the opportunity to exercise their First Amendment rights by casting their votes for petitioners."[23] Id. at 164-65. Johnson indicated that a candidate's exclusion from a televised debate in itself does not severely impinge on voters' constitutionally protected right to cast their votes effectively. We agree and see nothing that differentiates the burden on voters' rights in this case from the minimal burden assessed in Rogers based on plaintiff's failure to meet the CFB Program deadline and subsequent exclusion from the debates.[24]

Since the debate deadline is therefore also only minimally burdensome to voters' rights, it need only be non-discriminatory, reasonable, and justified by the pursuit of important regulatory interests in order to be considered constitutional. Timmons, 520 U.S. 351 at 358. Mr. Piccolo does not allege any facts that suggest

---

[23] Johnson focused primarily on the plaintiffs' challenge under the Communications Act. 829 F.2d at 161-64. It is instructive, however, in its conclusions regarding the minimal effect that exclusion from televised debates will have on voters' rights.

[24] Whatever minimal effects this exclusion may have in this context are also limited, since exclusion from the CFB-mandated debates have no bearing on whether candidates will participate in other debates in attempts to garner votes. See N.Y.C. Admin. Code § 3-709.5(ii).

that the deadline does not meet all of these requirements.

Mr. Piccolo does not allege or even imply that the deadline is not uniformly applied to all candidates or that it functions in a discriminatory manner. All potential candidates are required to apply to the CFB Program by June 1 in order to overcome this particular barrier to participation and gain access to the initial eligibility pool for the debates.

The deadline for participation in the debate program also appears reasonable. Inclusion of every mayoral hopeful is clearly unworkable and a deadline is a reasonable starting point –– as it is in other contexts –– to begin to limit the field of participants to a manageable group. Cf. Forbes, 523 U.S. at 681 (suggesting that a debate including "all ballot-qualified candidates" might undermine rather than enhance its value).

The connection between the matching-funds program and debate program deadlines also seems reasonable, instead of "arbitrary" as plaintiff suggests. The CFB limits debate participation to CFB Program participants –– and thus uses the June 1 deadline for both programs –– in order to make candidates who are receiving public funds more accountable to the public. See, e.g., N.Y.C. Admin. Code § 3-709.5(9)(requiring return of matching funds from any

participant required to participate in the debates who does not, barring such participants from receipt of additional funds in that election, and noting possibility of civil penalties). Contrary to Mr. Piccolo's suggestions, this CFB requirement would seem to promote public exposure and voter choice rather than limit it.[25]

Additionally, candidates tending to question the value of participation in the CFB Program may join in order to reap various benefits of the program, including the assurance that they will be involved in the debate program if they meet the other relevant eligibility requirements. The shared deadline is therefore related to encouraging participation in and ensuring compliance with the CFB Program, which we have already concluded serves important regulatory interests.

Since the debate-participation deadline, in isolation or in its connection with the overall CFB Program, is a minimal burden on voters' rights, and plaintiff fails to allege any facts suggesting that it is discriminatory or unreasonable, he has failed to state a claim that the deadline is unconstitutional.

---

[25] According to the defendant, the debate program was actually created to remedy the fact that candidates receiving public funds were not regularly participating in public debates. (See Loprest Aff. Exs. C & K).

c. The Voter Guide Deadline

Mr. Piccolo claims that the deadline for submission of a primary candidate's photograph and profile for inclusion in the Voter Guide impermissibly burdens voters' rights. The deadline for these submissions differs from the deadline for participation in the matching-funds program in that it is set by the CFB rules rather than by statute. See N.Y.C. Charter § 1053 (authorizing board to "promulgate such rules as it deems necessary for the preparation and publication of the guide"); CFB Rule 10-02(b)(4)(i)(setting the deadline as "not later than 12 weeks prior to the primary election or such other time as prescribed by the Campaign Finance Board"). In 2005 the deadline for submissions of photographs and candidate profiles was June 8.

We derive from Mr. Piccolo's experience that one who does not submit these materials on time and in the proper format will not have his photograph and profile included in the Voter Guide, but will nonetheless be included in the Voter Guide's comprehensive list of candidates on the ballot. The Voter Guide included Mr. Piccolo's name in the list of candidates for mayor in the 2005 primary; an asterisk indicated that he "did not submit a Voter Guide profile in time for inclusion in this Voter Guide." (Loprest Aff. Ex. I).

47

Mr. Piccolo alleges that the exclusion of his profile from the Voter Guide was a result of the "arbitrary and capricious" deadline for submissions, which "interfer[ed] in the process by  which voters, legitimate political parties and their members chose their candidate of choice in [the] primary election," because "a city agency and public funds [were] used to give the voting public the false impression [that] Mr. Piccolo [was] not willing to participate in the Voter Guide." (Am. Compl. 5, ¶ 5).

We assume _arguendo_ that a reader of the Voter Guide could conceivably draw that inference –– even though the guide stated that Mr. Piccolo simply missed the deadline for submissions –– and that such an inference might create an unfavorable impression, and, further, that such a circumstance could possibly amount to some perceptible burden on voters' rights. Even so, the uniform application of a reasonable and non-discriminatory restriction that serves important regulatory interests is enough to justify a less-than-severe burden.

Mr. Piccolo does not seem to dispute the uniform and non-discriminatory application of the June 8 deadline.[26] Instead, Mr.

---

[26] Mr. Piccolo does not allege that other candidates missed the deadline and were nonetheless covered more comprehensively by the guide. Such an allegation could potentially form the basis of a constitutional claim.

Piccolo attacks the reasonableness of the deadline in a manner similar to that which he uses to challenge the June 1 CFB Program deadline: he argues simply that the June 8 deadline is "arbitrary and capricious" because it is "long before" the petition submissions required for candidacy. (Am. Compl. 5, ¶ 6). This lone and undisputed factual allegation simply does not suggest that the deadline was unreasonable or discriminatory.

The evident purpose of the deadline is to allow the CFB time to prepare and distribute the Voter Guide, as required by the Charter. The New York City Charter mandates that the Voter Guide include certain information about candidates and technical aspects of the voting process, and it requires that the guide be translated into Spanish and "any other languages the board determines to be necessary and appropriate."[27] N.Y.C. Charter § 1053. Distribution in New York City to all voting households was undoubtedly a gargantuan task. If the CFB had adopted a later deadline that would have allowed Mr. Piccolo's initial submission -- dated July 24 -- to be included in the guide, it is hard to see how the CFB would have been able to put together a coherent guide meeting these requirements in time for an August publication date, much less

---

[27] According to the defendant, the 2005 primary election Voter Guide was also translated into Chinese and Korean. (Loprest Aff. ¶ 59).

assure its quality and accuracy.[28]

The purposes served by the publication of the guide are of course entirely legitimate. It promotes the valid interests of encouraging voter participation and educating the voting public. See, e.g., Anderson, 460 U.S. at 796 (stating that there is "no question" as to the legitimacy of the state interest in "fostering informed and educated" voter expression). It is equally evident that the deadline is an important component of ensuring that this goal is accomplished.

In sum, Mr. Piccolo fails to allege facts suggesting that the June 8, 2005 deadline, which required candidates to submit their photographs and profiles to the CFB in order to be included in the Voter Guide, impermissibly burdened voters' rights.

### 4. Free Speech and the Debate-Eligibility Criteria

With regard to the debates, plaintiff challenges not only the

---

[28] We also note that Mr. Piccolo's submission was not in the format mandated by the CFB. (See Am. Compl. Ex. 7; Loprest Aff. ¶ 25 n.6 & Ex. D). Presumably, deletion of all CFB formatting requirements for candidate statements would require more, not less, processing time. Plaintiff also does not account for the fact that his submission would have seemingly been late even by his own preferred deadline -- that which would match the BOE deadline of accepting or declining submitted petitions, July 18.

participation deadline, but also the eligibility criteria requiring that he demonstrate a minimal level of monetary and popular support to be eligible for debate participation.[29] He complains that the criteria are akin to an impermissible popularity contest, implicating the fundraising and polling thresholds. (Am. Compl. 3-4, ¶ 2). Mr. Piccolo acknowledges that eligibility for debate participation is governed in the first instance by criteria outlined in the Administrative Code, and he refers to those criteria in his complaint. (Id. 2). He also argues that the CFB impermissibly "administ[ers] and organize[s] [o]fficial [d]ebates to the various candidates and then proceed[s] to require some of the candidates for that public office to participate under penalty if they refuse, invite[s] yet other candidates if they so wish to participate, and summarily den[ies] others any right to participate whether they request to or not" (id. 4-5, ¶ 4), presumably referring to the additional criteria created by the debate sponsors and approved by the CFB.

---

[29] Although CFB Program participants who meet all eligibility criteria are required to participate in the debate, the CFB does not have discretion to invite non-participants to the debates. Such invitations may be extended by sponsors, but invitees also must meet the debate-eligibility requirements prescribed by N.Y.C. Admin. Code § 3-709.5(5)(b). Presumably, this measure is designed to preserve the debates' incentivizing function while avoiding the anomalous possible result otherwise: a debate that does not include an entirely privately funded frontrunner with broad public support.

Necessarily, Mr. Piccolo's challenge is set in the context of his having missed the deadline for CFB participation, thus excluding him from the initial pool of candidates to whom the debate-eligibility criteria were applied. He does not address whether he met any of the debate-eligibility criteria set by the Code or the additional criteria separately agreed upon by the CFB and media sponsors, all of which both CFB participants and non-participants must meet to participate in the debates. See N.Y.C. Admin. Code § 3-709.5(5)(b)(i)-(ii). He also does not cite any specific part of the criteria that he finds particularly problematic. His language is broad enough to implicate all of the criteria, which all involve threshold levels of monetary support and poll popularity that non-participants must meet in order to be eligible for a possible invitation to participate in the debates.[30]

_____

[30] We note here parenthetically that Mr. Piccolo does not allege that he met any or all of these criteria and was nonetheless disregarded when media sponsors arbitrarily and "summarily den[ied candidates] any right to participate whether they request to or not." (Am. Compl. 4-5, ¶ 4). The Code only specifies that non-participants who meet these criteria "may" be invited by media sponsors to participate in the debates. N.Y.C. Admin. Code § 3-709.5(5)(b)(ii). An allegation that plaintiff met all of the constitutionally permissible criteria but was nonetheless disregarded, while other similarly situated candidates were invited for participation, might be a firmer basis for a potential constitutional claim if the agency were also alleged to have participated in that decision, most likely under the Equal Protection Clause. That is not asserted here, nor are facts -- namely that plaintiff met the criteria or that he was treated uniquely among the candidates -- that would suggest the existence of such a claim.

Along the same lines, Mr. Piccolo's claim about the debate

Thus, we quote much of the pertinent language of the Code:

(b)(i) Except as otherwise provided in subparagraph (ii)
below, each debate for a primary, general or
special election shall include only those
participating candidates or limited participating
candidates the sponsor of each such debate has
determined meet the non-partisan, objective, and
non-discriminatory criteria set forth in any
agreement between the sponsor and the board;
provided, however, that the criteria for the first
debate for a primary, general, or special election
shall provide, among other criteria, (A) that a
participating candidate shall be eligible to
participate in such debate if he or she has, by the
last filing date prior to such debate, either (I)
spent, contracted, or obligated to spend, or (II)
received in contributions, an amount equal to or
more than twenty percent of the threshold for
eligibility for public funding applicable to
participating candidates contained in subdivision
two of section 3-703, and (B) that a limited
participating candidate shall be eligible to
participate in such debate if he or she has, by the
last filing date prior to such debate, spent,
contracted, or obligated to spend, an amount equal
to or more than twenty percent of the threshold for
eligibility for public funding applicable to
participating candidates seeking the office for

_____

seems to manifest some level of misunderstanding regarding the
participation requirements. Even though he acknowledges that the
Code sets much of the criteria for participation, he nonetheless
implies that the selection of candidates for participation in the
debates was arbitrary. That is clearly not the case. Whatever
process followed the initial application of the eligibility
criteria to the primary candidates -- that is, the process by
which a debate sponsor chooses whether to exercise its option to
invite CFB non-participants who meet the criteria -- is not
subject to our analysis because such a mechanism is beyond the
scope of the complaint. It is clear that primary candidates are
not required or eligible to be invited to participate in the
debates if they do not meet all of the eligibility criteria. Mr.
Piccolo's language betraying an understanding otherwise is simply
misguided.

which such debate is being held contained in
subdivision two of section 3-703; provided,
further, that the second debate for a primary,
general, or special election shall include only
those participating candidates or limited
participating candidates who the sponsor has also
determined are leading contenders on the basis of
additional non-partisan, objective, and
non-discriminatory criteria set forth in any
agreement between the sponsor and the board.
Nothing in this provision is intended to limit the
debates to the two major political parties.

(ii) If a debate sponsor has determined that a non-
candidate has met all the non-partisan, objective,
and non-discriminatory criteria applicable to
participating candidates or limited participating
candidates for access to any of the primary,
general, or special election debates, the sponsor
may invite that candidate to participate in such
debate. In the case of a run-off primary election
or a run-off special election, the sponsor may
invite a non-participating candidate to participate
in such debate.

N.Y.C. Admin. Code § 3-709.5(5)(b)(i)-(ii).


Subsection (b)(ii)'s provision that non-participants may be
invited only if they meet "all the non-partisan, objective, and non-
discriminatory criteria applicable to participating and non-
participating candidates" presumably refers to everything included
in subdivision (b)(i) as well as the additional criteria authorized
but not required by the Code. In turn, subdivision two of section
3-703 of the Code, which designates the monetary requirements for
CFB participants to be eligible for public funding, requires that
primary candidates for the office of mayor must raise "not less than

two hundred fifty thousand dollars in matchable contributions comprised of sums of up to two hundred fifty dollars per contributor including at least one thousand matchable contributions of ten dollars or more . . . ." Id. at § 3-703(2)(a)(1). Finally, the "additional non-partisan, objective, and non-discriminatory criteria" used for the 2005 primary debates and approved by the CFB were that for the first debate, all participants, prior to the debate, must have polled at five percent or higher in selected polls, and for the second debate, statutorily limited to "leading contenders," must have raised or spent at least $250,000.00 and polled at ten percent or higher in the selected polls. (Loprest Aff. ¶ 22).

Thus, in order to participate in the primary debates, a candidate -- CFB participating or not -- must meet the eligibility criteria that the Code mandates, as well as the additional criteria that the CFB and media sponsors develop together. For the purpose of analyzing all of these criteria, we will assume arguendo that their application constituted state action, thus implicating the First Amendment protections of candidates and the Supreme Court's forum-doctrine analysis. We nevertheless conclude that, although there might be a colorable argument that application of all of the criteria collectively constituted state action even though the debates were held by private media sponsors, there is no colorable

argument that the criteria were constitutionally impermissible. <u>Cf.</u> <u>Palmer v. Fox Broadcasting Corp.</u>, 2002 WL 31027440, at *2 (E.D. La. 2002)(making the same assumption as to state action for the purpose of analysis).

The pertinent analysis is controlled by <u>Ark. Educ. Television Comm'n v. Forbes</u>, 523 U.S. 666, 682-83 (1998), in which an independent candidate sued a state-operated television station for his exclusion from the debate broadcast. The <u>Forbes</u> Court found that the television station was engaging in speech activity when it exercised editorial discretion to select certain candidates for participation in its debates, <u>id.</u> at 674, and that given the goal of the debate to "allow the candidates to express their views with minimal intrusion by the broadcaster" and the "significance [of candidate debates] in the electoral process," the debate constituted a "forum of some type." <u>Id.</u> at 675-76. Applying forum doctrine precedents, the Court further found that the state broadcaster's debate was a non-public forum from which candidates could be excluded based only upon reasonable and viewpoint-neutral criteria.[31] <u>Id.</u> at 681-83.

---

[31] The viewpoint-neutral eligibility criteria in <u>Forbes</u> were justified in the non-public forum of a television debate partly because of the broadcaster's legitimate exercise of journalistic discretion. <u>Id.</u> at 674-75.

The debate program in <u>Forbes</u> imposed requirements related to a threshold level of perceived public support. The Supreme Court accepted as viewpoint-neutral and reasonable the public network's seemingly informal assessments that neither voters nor news organizations considered Forbes a "serious" candidate, and that he had received "little, if any, financial support." <u>Id.</u> at 682. The Court therefore held that Forbes' exclusion from the debate was constitutionally permissible. Thus, the criteria that plaintiff here challenges -- measuring popular support by polls and financial contributions -- are acceptable forms of viewpoint-neutral and reasonable debate-eligibility criteria.

In sum, plaintiff's constitutional challenge to the debate-eligibility criteria established by the Code and the debate sponsors is legally insufficient, and should therefore be dismissed.

C. <u>State and City Claims</u>

Finally, we briefly mention the allusions in plaintiff's complaint to potential violations of State and City law. The complaint states that the deadlines at issue operate "in defiance of [the BOE] certification" of plaintiff's candidacy, "contradict those [deadlines] of New York State Law and the New York City Board of Elections for qualifying . . . to become a candidate," and "are

57

beyond the requirements of law as administered by the New York City Board of Elections for qualifying as a candidate." (Am. Compl. 2; 4, ¶ 3; 6, ¶ 7).

The District Court has supplemental jurisdiction over the State and City law claims -- to the extent they are distinguishable in Mr. Piccolo's pleadings -- because they clearly involve the same facts and are part of the same case or controversy as his federal constitutional claims. 28 U.S.C. § 1367(a). Where, however, as here, we conclude that the federal constitutional challenges fail to state viable claims for relief and warrant dismissal, the District Court may decline to exercise jurisdiction over the pendent State and City law claims. 28 U.S.C. § 1367(c)(3). Indeed, this is the preferable course as it will allow the pursuit of these claims in local fora, if appropriate. Klein & Co. Futures, Inc. v. Board of Trade of City of New York, 464 F.3d 255, 262 (2d Cir. 2006)("It is well settled that where, as here, the federal claims are eliminated in the early stages of litigation, courts should generally decline to exercise pendent jurisdiction over remaining state law claims."); Giordano v. City of New York, 374 F.3d 740, 754 (2d Cir. 2001)("[T]he state-law claims should be dismissed so that state courts can, if so called upon, decide for themselves whatever questions of state law this case may present."). Thus, we recommend declining to engage in the merits-related 12(b)(6) review of any potentially discernible

State and City law claims and dismissing them without prejudice. Notwithstanding this recommendation, and in the interest of completeness of this report, we briefly summarize the overt shortcomings of plaintiff's State and City law claims as currently pled.

Mr. Piccolo focuses on the fact that the deadline for inclusion on the primary election ballot itself -- specifically the deadline for submitting a qualifying petition under the New York State Election Law -- differs from the deadlines of the CFB-administered programs. Plaintiff seems to imply that the state deadline to file a qualifying petition should invalidate the earlier deadlines for the separate CFB programs. Aside from merely referring in vague terms to State and City law, Mr. Piccolo offers no grounding in law or fact for this contention. The provisions of the State Election Law and City Code are neither contradictory nor inconsistent, as they provide different deadlines in the service of different functions. See N.Y. Elec. Law §§ 6-146, 6-158; N.Y.C. Admin. Code §§ 3-703, 3-709.5. The same reasoning applies to the deadline set by the CFB for submissions to the Voter Guide: Mr. Piccolo offers no clear argument as to how this deadline contradicts, much less violates, any State Election Law or City Code provisions.

Furthermore, there is no reason to believe, contrary to

59

plaintiff's implications, that a candidate who met all of the deadlines for the CFB programs -- which concededly precede the BOE's petition-submission deadline -- would feel pressure to commit to being on the ballot due to the earlier CFB deadlines and that such pressure would impermissibly interfere with the election process. (Am. Compl. 6, ¶ 7). As seems clear, and is noted by the CFB, prospective candidates may enroll in the Program and then choose not to run in the primary election. (Loprest Aff. ¶¶ 14, 54).

### Conclusion

For the reasons stated above, we recommend that plaintiff's claim for injunctive relief with respect to the 2005 election programs be dismissed as moot, and we further recommend granting defendant's motion to dismiss the balance of the federal claims pursuant to Federal Rule of Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. Finally, we recommend that the court decline to exercise jurisdiction over any discernable pendent State and City law claims.

"When granting a motion to dismiss, courts ordinarily allow leave to replead," especially where a pro se plaintiff's claims fail. Sullivan v. Schweikhard, 968 F. Supp. 910, 916 (S.D.N.Y. 1997). Given the analysis above, plaintiff would not be able to state a claim, consistent with the facts he alleges in his amended

complaint, that the CFB program deadlines or criteria violate voters' rights or his First Amendment rights. Nonetheless, due to his <u>pro se</u> status and a seemingly remote possibility that amendment alleging discriminatory application of these deadlines or criteria could adequately state a claim for relief, which plaintiff does not address in his complaint, we recommend granting 30 days for plaintiff to amend his pleadings in this regard if he has a reasonable good-faith basis for making such allegations of discrimination. <u>See</u> <u>id.</u> at 917 (denying leave to replead due process claim while granting leave to replead retaliation claim).

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable George B. Daniels, Room 1340, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York 10007-1312. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. <u>See</u> <u>Thomas v. Arn</u>, 474 U.S. 140, 150 (1985), <u>reh'g denied</u>, 474 U.S. 1111 (1986); <u>DeLeon v. Strack</u>, 234 F.3d 84, 86 (2d Cir. 2000) (citing <u>Small v. Secretary of Health and Human Services</u>, 892 F.2d 15, 16 (2d Cir. 1989)); 28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

**Dated: New York, New York**
**September 11, 2007**

**RESPECTFULLY SUBMITTED,**

**MICHAEL H. DOLINGER**
**UNITED STATES MAGISTRATE JUDGE**

Copies of the foregoing Report and Recommendation have been sent to:

Mr. Arthur Piccolo
606 2nd Avenue
New York, NY 11215

Sue Ellen Dodell, Esq.
New York City Campaign Finance Board
40 Rector Street
New York, NY 10006

Jordan E. Stern, Esq.
Becker, Gynn, Melamed & Muffly
299 Park Avenue
New York, NY 10171